# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ANITA L BEMI and DANIEL J. BEMI,

       Plaintiffs,

     v.                                    Case No. 07-C-591

MEGTEC SYSTEMS INC. and
MIDWEST SECURITY ADMINISTRATORS INC.,

       Defendants.

---

## DECISION AND ORDER GRANTING
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

---

Anita and Daniel Bemi filed this action for judicial review of an adverse benefits determination under the medical benefit plan provided by Daniel's employer MEGTEC Systems, Inc. ("MEGTEC")  Anita, Daniel's daughter, was terminated as a participant under the Plan following a tragic accident that occurred before she completed her first year of college.  Because she was unable to continue her education after the accident, Anita was no longer eligible for coverage under the Plan as a dependent student.  The Bemis contend, however, that Anita remained eligible as a disabled dependent.  MEGTEC determined that Anita was not disabled within the meaning of the Plan, however, and terminated her coverage on November 1, 2004.  The Bemis seek declaratory and injunctive relief reinstating Anita as an eligible dependent under the Plan, reimbursement for health insurance and other expenses incurred since her termination, and attorneys fees and costs.

The MEGTEC Systems Inc. Employee Health and Welfare Benefit Plan, also known as the MEGTEC Systems Inc. Medical Benefit Plan, Group No. 0080511 ("the Plan") is a self-funded

"employee benefit plan" subject to and governed by the provisions of the Employee Retirement Income and Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* (Compl. ¶ 7.) This Court has original federal jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132 (e), and federal supplemental jurisdiction pursuant to 28 U.S.C. § 1367. The case is presently before the Court on the Bemis' motion for summary judgment. For the reasons set forth below, the motion will be granted.

## I. BACKGROUND

On May 16, 2003, Anita Bemi, a full-time student at the University of Wisconsin-Milwaukee ("UWM"), was struck by a car while walking as a pedestrian and severely injured. Anita was comatose for approximately eight days and sustained the following injuries: fractures to her ribs, collarbone and left iliac wing; injuries to her spleen, lung, and liver; closed head trauma consisting of a subarachnoid hemorrhage; brain-shear; physical injuries to the frontal lobe of her brain resulting in internal swelling, squeezing, severance and disruption of brain nerve tissue; and internal bleeding in and about her brain. The most serious injury was traumatic brain injury ("TBI"). (AR 30:B-00379). CT scans disclosed substantial brain damage caused by the internal hemorrhage, brain-shear, and physical injuries to her frontal lobe. (AR 9: B-00330; Flanner Aff. Ex. H.) In March 2004, she was diagnosed with Organic Brain Syndrome ("OBS"), due to residual problems in cognitive functioning due to the TBI. (AR 6:B-00303.) The effects of the OBS include: diminished cognitive ability, speech impairment, short-term memory loss, fatigue and hypersomnia, anxiety, irritability, and depression. (AR 6:B-00301-05.)

2

At the time of the accident, Anita's father, Daniel Bemi, was a covered employee under the MEGTEC Systems, Inc. Employee Health and Welfare Benefits Plan. The Plan defines a covered dependent as:

> A covered employee's unmarried natural born . . . child . . . for which the employee has a legal obligation to provide full or partial support; whose age is less than the limiting age. Each child must qualify as a dependent on the covered employee's most recently filed federal tax return and receive at least 50% support and maintenance from the covered employee . . .
>
> The limiting age for each dependent child is:
>
> a. 19 years, or
>
> b. 25 years, if such child is in regular full-time attendance, as determined by the school, at an accredited secondary school, college or university; . . .
>
> If from the date a dependent child reaches a limiting age, all the following conditions exist at the same time:
>
> 1. The child is mentally retarded or physically handicapped;
> 2. The child is incapable of self-sustaining employment;
> 3. The child is dependent on the covered employee for at least 50% support and maintenance; and
> 4. The child is unmarried,
>
> that child will remain an eligible dependent of a covered employee or may be enrolled as the dependent of a new employee. If the child has not continuously satisfied all the conditions above since reaching a limiting age, the child will not be eligible for coverage under the plan.

(AR 1:B-00068.) Anita was born on September 8, 1983, and was nineteen at the time of the accident. Despite her age, there is no dispute that Anita's full-time student status qualified her as a covered dependent prior to the accident. The coverage question presented by the case is whether

3

she met the Plan's four criteria for "dependent child" before her status as a full-time student changed.

Under the terms of the Plan, MEGTEC, as the employer, was the Plan Administrator. (AR 1:B-00073.) The Plan vested in the Plan Administrator the discretionary authority to interpret the Plan and determine eligibility:

> **DISCRETIONARY AUTHORITY**
> Benefits under this plan will be paid only if the *plan administrator* decides in its discretion that the *covered person* is entitled to the benefits. The *plan administrator* will have full discretion to interpret *plan terms*; make decisions regarding eligibility; and resolve factual questions. This discretion will apply with respect to all claim payments and benefits under the *plan*.

(AR 1:B-00114.)

MEGTEC contracted with Midwest Security Administrators, Inc. ("MSA") to provide administrative services, and review and process claims under the Plan. (AR 3.) As the Plan Sponsor, however, MEGTEC retained all discretionary authority to interpret the Plan and to decide all appeals. (AR 3:B00246, ¶ 5.)

Shortly after the accident, Daniel Bemi made a claim on behalf of Anita for medical benefits under the Plan. (Compl. ¶ 18). The Plan covered Anita until October 31, 2004; in a letter dated October 26, 2004, MSA notified Daniel Bemi that Anita's coverage would terminate on October 31, 2004 because Anita no longer met the definition of dependent under the Plan. (AR 9:B-00311.) The letter stated that Anita did not meet two of the four disability requirements; the letter stated that she was not mentally retarded or physically handicapped, and that she was not incapable of self-sustaining employment. (AR 9:B-00312.) The letter did not include instructions as to how to appeal the denial of benefits by the Plan. (*See* AR 9:B-00311-12.)

4

In a letter dated December 8, 2004, Daniel Bemi stated his intent to appeal the decision to terminate coverage of Anita pursuant to the "Claim Appeal Procedure" set forth in MEGTEC Systems group policy. (AR 11:B-00315.) The letter requested all "pertinent plan administration documents, including but not limited to, those specific documents that were used to determine that Anita 'does not meet the four disability requirements under the plan'" (*Id.*) In addition, the letter requested MSA provide the name of the medical consultant who evaluated Anita's eligibility. (*See id.*) In response, MSA stated, in a letter dated December 23, 2004 that the determination was based only the information in the medical records, and was made without the use of a medical consultant. (AR 12: B-00323.) In addition, the letter stated that it was MSA's belief that the medical records showed that Anita was not mentally retarded or physically handicapped and capable of self-sustaining employment. (*Id.*)

In March 2005, the Bemis sent additional medical information and a letter outlining their position on the issue of eligibility to MSA as part of the appeal process. (AR 14:B-000326-28.) The Bemis requested that their appeal be reviewed by a physician with expertise in TBI and OBS. (*Id.*) MSA forwarded the information MSA initially reviewed to determine eligibility, along with Dr. Grunert's progress note dated December 23, 2004 to Medical Review for appellate claim review. The Plan consulted with Dr. Meyer, a general practitioner, to evaluate the records pertaining to the claim appeal. (*Id.*) Dr. Meyer wrote that Anita was "incapable of self-sustaining employment due to her injuries and fatigue," although he determined that Anita would not fit "a" definition of being mentally retarded or physically handicapped. (AR 16: B-00337.) As a result of the review by Dr. Meyer, Ms. Besaw sent the Bemis a letter dated April 1, 2005 stating that MSA

5

submitted all the new information from the Bemis, as well as the previous records, to the reviewing physician. (AR17:B-00338.) The letter also stated that the medical consultant determined that "although [Anita] is incapable of self-sustaining employment due to her injuries and fatigue, she does not fit the definition of being mentally retarded or physically handicapped." (*Id.*)

After the appeal claim had been denied, Anita underwent extensive testing at the University of Wisconsin Whitewater by a vocational expert who prepared a detailed report regarding the extent of Anita's ability to work and live on her own. Dr. Wenkman, Ph.D., L.P.C., C.R.C.C., concluded that Anita was "a long way from being independent" and at that time she was "not ready to work independently or to live in a completely independent setting." (AR 23:B-00361.) In addition, Dr. Wenkman also stated that "[c]learly Anita has the ability to improve in the future but currently is disabled both physically and emotionally as a result of significant deficits in concentration, conversation, decision-making, safety and short-term memory." (*Id.*) Dr. Wenkman referred to Anita's problems with fatigue as "extreme" causing her to not be able to function for more than three hours at a time without rest. (*Id.*) Dr. Wenkman stated that Anita would likely require a one-to-two-hour nap between activities, and if she were required to go beyond that time, she would be unable to function with the skills necessary to carry out schoolwork or simple routine work. (*Id.* at B-00361-62.) In addition, Dr. Wenkman stated that Anita's fatigue was "likely a combination of physical, emotional and cognitive deficits directly related to brain injury." (*Id.* at B-00362.)

The Bemis forwarded Dr. Wenkman's report to Michael Roberts, MEGTEC's designated Plan fiduciary, who wrote a letter to MSA, dated September 7, 2005, asking, among other things, whether the report would affect Anita's eligibility for benefits. (AR 20:B-00349-50.) MSA, specifically Ms. Besaw, sent the Dr. Wenkman's report to Paula Wheeler, a Registered Nurse, for

6

review on September 9, 2005. (AR 19: B-00348.) The attached memo from Ms. Besaw states, in pertinent part:

> I really need your help on this particular matter. . . . The group is asking us to review this evaluation and see if this changes our findings in any way. I don't really feel it does however I need a medical professional to make this determination. There are parts of the evaluation that state she is incapable of self-sustaining employment and that her brain injury may be more extensive than it appears but then it does state that she is able to drive and can take some classes. I'm really struggling with this one. . . . If the determination is still that we do not feel she meets the definition of a dependent, I really need some type of written documentation that I can use to explain the denial.

(*Id.*)

Ms. Wheeler wrote to Ms. Besaw on September 29, 2005, stating that the vocational evaluation of June 2005 did not state that Anita was disabled. (AR 21:B-00351.) Ms. Wheeler also wrote that Anita was capable of taking classes and succeeding; that there was no documentation that the fatigue would be a permanent condition; that under supervision Anita would be able to develop more stamina; and, while "it may not be at the income level prior to injury, she would be capable of self-sustaining employment." (*Id.*) Ms. Wheeler did not state what type of self-sustaining employment Anita would be able to perform.

Ms. Besaw sent a letter to the Bemis, dated September 29, 2005, reiterating that Anita did not meet the definition of an eligible dependent under the Plan. (AR 22:B-00352.) Ms. Besaw essentially restated Ms. Wheeler's review of the vocational evaluation. (*Id.*) Subsequently, the Bemis obtained legal counsel to continue to pursue the reinstatement of benefits under the Plan. (AR 23:B-00353-54.)

7

In a letter dated March 20, 2006, the Bemis' attorney requested that MSA reconsider its decision to deny benefits. (AR 27: B-00376.) The letter also requested confirmation that a qualified, licensed medical practitioner either reviewed Dr. Wenkman's findings, or disagreed with them. (*Id.*) Ms. Besaw responded in a letter dated April 3, 2006, conveying Ms. Wheeler's status as a Registered Nurse with credentials as an MBA, CRRN - Certified Rehabilitation Registered Nurse and CMM-Certified Case Manager. (AR 29:B-00378.)

The case proceeded to litigation, but during the pendency of the case, MEGTEC decided to submit the file, including updated medical information, to an independent medical reviewer, Medical Review Institute of America, Inc. ("MRI"). (AR 44:B-00405-06; AR 45:B-00407.) The MRI reviewer determined from its evaluation of the file that Anita did not meet the definition of physically handicapped or mentally retarded as those terms are commonly used in the medical community. (AR 45:B-00407-11.) The MRI reviewer did not provide a definition of how the terms are commonly understood in the medical community. However, the MRI reviewer did state that after Anita's accident, Anita subsequently suffered from a "movement disorder, memory problems, fatigue, anxiety, frontal lobe dysfunction, hypersomnia, myofascial pain, emotional labiality, inattention, and impulsivity." (*Id.* at B-00408.) In addition, the MRI reviewer noted that to be "'physically handicapped' generally a TBI would be required to cause motor, sensory, or physical disability." (*Id.* at B-00409.) The reviewer stated that TBI could cause "physical handicaps such as motor slowing, loss in vision, etc." (*Id.*)

In a letter to MEGTEC dated September 12, 2008, MSA (n/k/a United Medical Resources) enclosed MRI's report, and stated that "[t]here is no dispute that Anita meets the criteria of #2-4 above." (AR 46:B-00412 (referring to the four criteria needed to meet the eligibility requirements

8

after a dependent child reaches a limiting age.)) MSA further stated that "[t]he main question continues to be in regards to the criteria of #1." (*i.e.*, whether the child is mentally retarded or physically handicapped) (*Id.*) The letter also confirmed that under the terms of the Plan and the Administrative Services Agreement, MEGTEC, as Plan Administrator and Plan Sponsor, had final decision-making authority as to the Plan Interpretations, including Anita's eligibility. (*Id.* at B-00413.) MSA stated that it was providing the information to MEGTEC to allow MEGTEC to reach a final decision regarding Anita's eligibility. (*Id.*)

Even though MSA, in its September 12, 2008 letter, specifically refers to MEGTEC as the Plan Administrator, MEGTEC's counsel, in a letter dated December 22, 2008, stated as follows: "MEGTEC Systems, Inc., as plan administrator and plan sponsor, did and does adopt the recommendation of the plan's administrator, United Medical Resources [MSA]." (AR 48:B-00415.)

During the fall semester of 2004, Anita enrolled in a college-level class, an anatomy and physiology class, but needed disability related services — note takers and adapted testing—to assist her in the class. (AR 23:B-00358.) She attempted to take two classes in the fall of 2005, but withdrew from one of the classes due to lack of mental stamina. (Anita Bemi Aff. ¶3; Ex. A.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of

9

demonstrating that it is entitled to summary judgment. *Celotex*, 477 U.S. at 323. Once this burden is met, the nonmoving party must present specific facts to support or defend its case. *Id.* at 322-24.

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion; however, there must be a *genuine* issue of *material* fact for the case to survive. *Id.* at 247-48.

"Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286,1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. A "genuine" issue of material fact requires specific and sufficient evidence that, if believed by a jury, would actually support a verdict in the nonmovant's favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita v. Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).


**III. STANDARD OF REVIEW FOR ERISA CLAIMS**

A denial of benefits challenged pursuant to 29 U.S.C. § 1132 (a)(1)(B) is generally subject to *de novo* review unless the benefit plan gives the administrator discretionary authority to determine a participant's eligibility for benefits. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If, however, the plan does give the administrator discretionary authority to interpret the plan and make eligibility determinations, review is deferential; a court will overturn

10

the decision of the administrator only if the decision is arbitrary and capricious. *O'Reilly v. Hartford and Accident Ins. Co.*, 272 F.3d 955, 959 (7th Cir. 2001).

The arbitrary and capricious standard has been expressed as follows:

> [A] court will not set aside the denial of a claim if the denial is based on a reasonable interpretation of the relevant plan documents. Nor will it do so where the trustee has based its decision "on a consideration of the relevant factors" that encompass the "important aspects of the problem" before it. If the trustee makes an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts, i.e., one that makes a "rational connection" between the issue to be decided, the evidence in the case, the text under consideration, and the conclusion reached, then the trustee's decision is final.

*Cuddington v. N. Ind. Pub. Serv. Co.*, 33 F.3d 813, 817 (7th Cir. 1994) (quoting *Exbom v. Cent. States, Se. & Sw. Health & Welfare Fund*, 900 F.2d 1138, 1142-43 (7th Cir. 1990)(citations omitted)).

Where, however, a plan administrator fails to exercise the discretion it has been granted by the Plan, the failure of the designated fiduciary to exercise discretion results in a court having no proper determination to which it can defer under the arbitrary and capricious standard. *Nelson v. EG & G Energy Measurements Group, Inc.*, 37 F.3d 1384, 1388-89 (9th Cir. 1994). Similarly, while a plan administrator may delegate its discretionary authority, many courts have held that the delegation of the fiduciary power to exercise discretion may not be implied; it must be expressly allowed by the plan. *See, e.g., Samaritan Health Center v. Simplicity Healthcare Plan*, 516 F. Supp. 2d 939, 948-49 (E.D. Wis. 2007). The Seventh Circuit left the question open in *Semien v. Life Ins. Co. of N. Am.*, but it noted that the Sixth, Eighth and Ninth Circuits had found that delegation of a plan administrator's discretionary authority must be express. 436 F.3d 805, 811 (7th Cir. 2006).

11

That was the conclusion reached by the district court in *Samaritan Health Center*, and it is the conclusion I reach as well. When the entity given discretion under the plan is not the entity that *uses* that discretion in denying benefits, the plan member has not received a benefit or eligibility determination in accordance with the terms of the agreement. As the Sixth Circuit noted, "deferential review under the 'arbitrary and capricious' standard is merited for decisions regarding benefits when they are made in compliance with plan procedures. When an unauthorized body that does not have fiduciary discretion to determine benefits eligibility renders such a decision, however, this deferential review is not warranted." *Sanford v. Harvard Industries, Inc.,* 262 F.3d 590, 597 (6th Cir. 2001). Here, Plaintiffs assert that no deference is owed to the Defendants' decision because the sole decision-maker was Midwest Security Administrators – not MEGTEC – and none of the Plan documents explicitly delegate such decision-making authority to any third parties. I address each of these assertions below.

Plaintiffs assert that MEGTEC essentially had nothing to do with the eligibility determination at all. At oral argument, Plaintiffs' counsel asserted that the decision by MEGTEC, the Plan Administrator granted discretion by the Plan documents, was the product of its "mindless rubber-stamping" of the conclusions of MSA. MEGTEC appointed Michael Roberts as MEGTEC's fiduciary to review claim appeals during the time relevant to this action. Whether or not MEGTEC's involvement was "mindless" or not, it is clear that MEGTEC did not exercise any of its discretionary authority. Three documents in the record reveal the limited extent of Roberts' involvement in the decision by MSA. The first document, an email dated October 26, 2004, not authored by Roberts, was sent, not in relation to Bemi's claim appeal, but rather the initial denial of benefits. (AR 8: B-00310.) The email refers to Roberts as directing Eligibility Representative

Jan Van Straten to "go ahead and proceed with the COBRA paperwork for Dan Bemi's daughter." (*Id.*) The second letter, which is authored by Roberts, is related to the claim denial appeal. (AR 20:B-00349-50.) In that letter, dated September 7, 2005 and addressed to MSA Team Supervisor Janice Besaw, Roberts states as follows:

> Our employee, Dan Bemi, submitted an appeal on March 13, 2005, to Midwest Security regarding the determination of eligibility for his daughter Anita Bemi under the group medical plan. This appeal and all previous records were forwarded to a *Midwest Security medical consultant for review*. According to *your letter* dated April 1, 2005, the determination *of the medical consultant* was that Anita did not meet the definition of an eligible dependant [sic] under the plan.
>
> Dan definitely disagrees with the results of the appeal process. However, before Dan makes any decision regarding his next move, he would like to make sure that *Midwest Security* has reviewed all the information regarding Anita. Shortly after the appeals decision, Dan sent Anita for a Vocational Evaluation at the University of Wisconsin Whitewater. The University of Whitewater is known for their outstanding work with individuals who have physical and mental disabilities. The results of the evaluation suggest that Anita is currently disabled both physically and emotionally. Based on the results of this report, Dan would like to know if this report would impact the decision making process that *Midwest Security* used to evaluate his daughter Anita.
> . . .
> If you could provide me with a response as soon as possible, I would greatly appreciate it.

(AR 20:B-00349-50 (emphasis added)).

The third letter, dated February 27, 2006, is addressed to Ms. Besaw and enclosed a medical release allowing MSA to release medical records to Anita's attorney. (AR 25:B-00372.) The italicized portions of excerpt from the September 2005 letter set forth above shows that MSA determined Anita's eligibility on appeal, not Michael Roberts. Although Roberts was copied on the correspondence from MSA to the Bemis, there is no indication from the record that Roberts directed

13

the decision-making process or the content of the communications. Instead, all indications are that everyone involved viewed Midwest Security and its consultants as the sole decision-makers. In fact, they were the only ones in possession of Anita's health records. Accordingly, it is clear that if anyone was exercising any discretion as to Anita's eligibility, it was MSA, not MEGTEC.

The second question is whether the Plan explicitly conferred such discretionary authority upon any third parties such as MSA. MEGTEC is identified in the Plan as the Plan Administrator. MEGTEC, as Plan Administrator, was vested with discretionary authority to interpret the Plan and determine who qualified as a covered person under the Plan:

> **DISCRETIONARY AUTHORITY**
> Benefits under this plan will be paid only if the plan administrator decides in its discretion that the covered person is entitled to benefits. The plan administrator will have full discretion to interpret plan terms; make decisions regarding eligibility; and resolve factual questions. This discretion will apply with respect to all claim payments and benefits under the plan.

(AR 1:B-00114; AR 2:B00222.)

The Plan does provide that the "plan administrator may employ other persons or firms to process claims and perform other services." (AR 1:B-00073.) A broad interpretation of "other services" could include delegating discretion to MSA to determine eligibility for claim appeals. But the "other services" clause is found in the definition of the Plan Administrator, not in the grant of discretionary authority. The Plan's grant of discretion, set forth above, states quite clearly that the "plan administrator will have full discretion to interpret plan terms [and] make decisions regarding eligibility." A Plan member would reasonably interpret this as meaning that it is only the Plan Administrator – not any third parties – that will have "full discretion" to make decisions on eligibility. The fact that the definition of "plan administrator" notes that the administrator may hire

14

other entities for "other services" does not broaden the meaning of "plan administrator" itself, especially with respect to the grant of discretionary authority. If the Plan had wanted to make that clear, it could easily have stated that discretionary authority was afforded to the Plan Administrator *or its agents*. It did not do so. Accordingly, I conclude that the Plan does not explicitly grant any discretionary authority to third parties. And because it was a third party that exercised the discretion in this case, no deference is due to that decision and the *de novo* standard of review will apply.


## IV. ANALYSIS

Deferential review of a benefits denial means a review limited to the administrative record before the Plan Administrator. *Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan,* 195 F.3d 975, 981-82 (7th Cir.1999). Where review is *de novo*, however, the parties may take discovery and present new evidence. *Id.* at 982. Under the de novo standard of review, the court also employs federal common law rules of contract interpretation in construing the terms of the plan. *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643-44 (7th Cir. 2007). The ultimate question before the district court under the de novo standard is whether the claimant is entitled to the benefits he seeks under the Plan. *Id.* Under the rules of contract interpretation, the court is to interpret the terms of the policy "in an ordinary and popular sense, as would a person of average intelligence and experience, and construe all plan ambiguities in favor of the insured." *Id.* at 644. Language is considered ambiguous only where it is subject to more than one reasonable interpretation. *Id.* Ambiguous terms in an ERISA plan are to be strictly construed against the insurer and in favor of the insured. *Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1096 (7th Cir. 1994)

15

(citing *Phillips v. Nat'l Life Ins. Co.*, 978 F.2d 302, 311-14 (7th Cir. 1992)). Additionally, the insured's proposed reading of the term must be reasonable when construing the ambiguous terms. *Id.*

Here, there are several terms in the Plan that are ambiguous. The first ambiguous term is "physically handicapped." The Plan does not define what a physical handicap is, or what being physically handicapped entails. The Defendants claim that "physically handicapped" only includes disabilities of the body, not the mind. The Plaintiffs assert that even if that is true, the brain is a physical part of the body and the cognitive deficits that Anita suffers render her physically handicapped.

Even using the Defendants' definition of physically handicapped, I conclude that Anita Bemi is physically handicapped. "The ordinary meaning of 'physically handicapped' is a bodily disability that leaves one incapacitated." "Physical" means "of or relating to the body." (*Webster's Collegiate Dictionary* 875 (12th ed. 2000)). "Handicap" means "physical or mental disability that substantially limits activity . . . ." (*Id.* at 526)). Anita Bemi's brain is a physical part of her body. She has a physical disability in that her injured brain causes extreme fatigue and other residual cognitive impairments. Her activity is limited in that she can attend class but needs significant assistance to do so. Her ability to drive and hold a job is significantly limited by her fatigue. Fatigue is certainly a partially mental condition, but it primarily affects a person *physically* as her muscles weaken and movements become restricted. Anita is only able to function at a task for three hours before needing rest or a nap. Her disability was caused by an injury to her brain from being struck by a vehicle. The record reflects that the CT scans of her brain evidence the physical changes from the closed

16

head trauma. In other words, Anita Bemi's brain is not structurally the same as it was prior to the accident.

As noted at the hearing, the Plan's distinction between physical and mental handicaps is understandable, as the latter kind of handicap is often harder to prove objectively and thus a broader grant of coverage could invite malingering or exaggeration in order to qualify for benefits. With the purpose of the mental/physical distinction in mind, it is easy to categorize Anita's injury as physical rather than purely mental not least because it was caused by a discrete physical event and had a physical effect on her brain. It was not, in other words, a condition brought on and experienced only in the subjective experience of Anita's mind. Certainly there are mental manifestations of the injury, but that fact does not remove it from the purview of physical handicap. Just as a limp may be the evidence of a previously broken, but currently healed leg bone, the deficits Anita is experiencing are evidence of the injury to her brain. She did not have any of these deficits prior to the accident. Those physical changes have resulted in changes to her physical need for sleep and rest. In addition, those physical changes to her brain have resulted in physical changes in her brain's ability to process information, focus and concentrate. The inability to focus and concentrate are outward manifestations of a physical change to her brain. Different doctors and psychologists have documented these manifestations, and most, if not all, have attributed the current cognitive function deficits to the TBI and subsequent OBS. As a result of the permanent physical injury to her brain, I find that Anita is physically handicapped. Therefore, Anita meets the first of the four criteria to qualify for coverage under the Plan.

The other disputed issue in this case is whether Anita is incapable of self-sustaining employment. The term "self-sustaining employment" is undefined in the Plan. The Defendants

17

assert that being capable of self-sustaining employment is shown by Anita's ability to take classes, walk her dogs, and work at a job part-time. However, the Defendants do not offer a definition of "self-sustaining employment." The term is not particularly nuanced, however, and one can reasonably conclude that it means one must be able to maintain and support herself by working. The record does not support the conclusion that Anita is capable of maintaining herself by independent effort. The Defendants state that the fact that Anita could take a class is evidence that she can support herself. Taking one class for one hour a day, four days a week, is hardly indicative of the ability to hold a job which would provide enough income for Anita to support herself, nor is her ability to take her dogs for a walk. Further, the record shows that she is able to work a part-time job, but that the few hours a week she works exhausts her and that she was fired from a ten-hour a week job due to her inability to perform the job functions. The vocational expert's report also stated that Anita needed constant supervision and was unable to work independently. Therefore, the documents in the record do not support Defendants' claim that Anita is able to support herself by working.

In fact, the record shows just the opposite. As part of the Bemis' claim appeal, the Defendants submitted Anita's records to Dr. Meyer to review. Dr. Meyer wrote that Anita was "incapable of self-sustaining employment due to her injuries and fatigue," although he determined that Anita would not be considered mentally retarded or physically handicapped. (AR 16: B-00337.) The Plaintiffs had Anita evaluated by a vocational expert, Dr. Wenkman, who stated that "[a]t this time, Anita is not ready to work independently or live in a completely independent setting," and "[h]er extreme problems with fatigue make it impossible to proceed with steps that

18

will require her to function more than three hours at a time without rest." (Compl. Ex. 7 p. 7.) In addition, Dr. Wenkman stated that without two to three hour naps between activities Anita would likely be unable to function with the skills necessary to do schoolwork or simple routine work. (*Id.* at 7-8.) Dr. Wenkman assessed Anita as "disabled both physically and emotionally resulting from the significant deficits in her concentration, conversation and ability to make decisions, short-term memory and safety. (*Id.* at 7.)

In *Tate v. Long Term Disability Plan for Salaried Employees. of Champion Int'l*, 545 F.3d 555, (7th Cir. 2008), the court held in favor of the employee, under the arbitrary and capricious standard, when the administrator denied benefits for a bipolar employee. *Id.* at 560. In *Tate*, the plaintiff qualified for benefits pursuant to her disability, but then the plan administrator denied benefits after four years, determining that Tate did not qualify as "totally disabled." *Id.* at 558. The administrator found that Tate's disability did not render her incapable of performing any job for which she was qualified, but failed to consider Tate's qualifications to determine whether her impairment affected her ability to work. *Id.*

It is the Plan's burden to make sure its determination is reached in a manner that substantially complies with ERISA requirements. *Id.* at 561. In *Tate*, the court held that the Plan was required, at a minimum, to assess her qualifications and how those qualifications comport with jobs that the employee might be able to perform in spite of her impairments. *Id.* at 562. The Seventh Circuit held that this assessment of qualifications was necessary for the Plan to make a reasonable determination that the employee was able to work in an occupation for which she was qualified. *Id.* The court found that the Plan's unsupported conclusions regarding Tate's ability to perform a job did not provide the requisite reasoning on which to base an effective review. *Id.* at

19

562. The court pointed out that the Plan was required to make an inquiry into Tate's medical condition, as well as her vocational skills and qualifications in order for its decision to deny benefits to be upheld. *Id.* at 561.

*Tate* is instructive here. Although the court used an arbitrary and capricious standard of review to evaluate the denial of benefits, the actions by both Plans are similar. Both Plans determined that the plaintiffs did not qualify for benefits because they were capable of employment, without inquiring into what skills and qualifications the plaintiffs had in light of the impairments from which the plaintiffs suffered. Both plaintiffs had qualified for benefits based on their disabilities prior to the denials by their respective Plans. Here, the Plan is required to make a reasonable inquiry into Anita's skills and qualifications for this Court to provide an effective review of the Plan's denial of benefits, which it did not do.

Based on the undisputed evidence in the record, I conclude that Anita Bemi is incapable of self-sustaining employment. Anita Bemi meets the second requirement under the Plan to qualify for benefits. Consequently, Anita Bemi meets all four requirements as a covered dependent under the Plan. The Plaintiffs' motion for summary judgment is therefore **GRANTED**. MEGTEC is directed to reinstate health benefits for Anita Bemi immediately nunc-pro-tunc to October 31, 2004, and to reimburse Daniel Bemi for his out-of-pocket costs incurred as a result of the termination of his daughter from the Plan, including the aggregate payment to MSA for all COBRA continuation payments for Anita Bemi. MEGTEC is also directed to pay all costs the Plaintiffs have incurred, including reasonable attorneys' fees, in challenging the termination of benefits for Anita Bemi, together with interest. Plaintiffs and MEGTEC are directed to consult with one another in an effort

20

to reach agreement on the amount to be awarded Plaintiffs and to notify the Court if they are unable

to reach agreement.  Judgment will await determination of that amount.  As it appears that MSA

served only as claims administrator, all claims against it will be dismissed.

     **SO ORDERED** this _____18th_____ day of December, 2009.

                               _s/ William C. Griesbach_____
                               William C. Griesbach
                               United States District Judge